**COMPANHIA ATLÂNTICA DE DESENVOLVIMENTO E EXPLORAÇÃO DE MINAS**

v.

**UNITED STATES.**

No. 22–53.

United States Court of Claims.

Jan. 20, 1960.

Francis A. Brick, Jr., New York City, for plaintiff. Mahlon F. Perkins, Jr., New York City, was on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

MADDEN, Judge.

The plaintiff, a Portuguese corporation, sues the United States for breach of contract. Under the reciprocity provisions of 28 U.S.C. § 2502 it has access to this court. The contract in suit was made on September 11, 1952. On October 27 of that year the United States purported to cancel the contract. The plaintiff says that the purported cancellation was nothing more than a repudiation, and therefore a breach, of a valid contract.

The contract in question was for the sale of tungsten by the plaintiff to the United States, the tungsten to be delivered over a period of 34 months. The Government says that it had the right to cancel the contract, by reason of a reservation in the contract of the right to do so upon the occurrence of a certain contingency, which contingency, it says, occurred, and also by reason of a breach by the plaintiff of a warranty, contained in the contract, against contingent fees. It also says that the plaintiff would not have been able to perform the contract, if it had not been canceled, and therefore was not damaged by not being permitted to attempt to perform it.

We have made voluminous findings of fact, which coincide with the findings made by the commissioner of this court. There were numerous witnesses, and the veracity or the proper interpretation of the testimony of some of them is questioned. The conclusion of the commissioner who heard the testimony and observed the witnesses is entitled to great weight. We shall, in this opinion, narrate the events only to the extent we deem necessary to make our discussion intelligible.

The United States desired to obtain tungsten for American industry and for

stockpiling. There were many tungsten mines in Portugal, poorly equipped mechanically. A good deal of tungsten was mined by individuals, with picks and shovels, who then marketed their product through dealers. In spite of its inefficiency, the industry prospered during World War II, but when the demand slackened after the war, there was little production by the smaller mining companies even though prices were still high in comparison to what they had been before the war.

A Portuguese enterpriser, Dr. Soares, began in 1950 to work on a plan, later developed by the plaintiff corporation, which envisaged the organization of production and marketing in such a way that there could be profitable operation of mines which otherwise would not operate. To do this it would be necessary to bring together a number of the small mining enterprisers under one management, and to obtain long-term contracts for the sale of the tungsten which the combined operation would produce.

An American, Mr. Pulvermann, who had had extensive experience in mine management in Germany before the war, was in Portugal in 1951 to examine a manganese mine. It did not interest him, but he looked into the possibilities of mining tungsten and came to the same conclusion which Dr. Soares had previously reached. He learned of Dr. Soares' interest and discussed the problem with him for several days. Dr. Soares gave him a 60-day option for the placement in the United States or in Europe of a contract for the sale of specified tonnages of tungsten and tin.

Mr. Pulvermann went to Washington and began to explore the possibilities of selling tungsten to the Government. He discussed the subject with Colonel Westbrook, with whom he had been associated in prior activities. Pulvermann and Westbrook, after investigation, decided that there was a possibility of getting a contract from the Government for the purchase of tungsten from the plaintiff. They considered the legal arrangement which Dr. Soares' company should make for the acquisition of the tungsten which it proposed to sell, and the arrangement which they, Pulvermann and Westbrook, should make for their compensation if the venture should succeed.

Pulvermann returned to Portugal. At his suggestion Dr. Soares persuaded several high Portuguese officials to become officers of his company.

Pulvermann and Westbrook began negotiations with United States Government officials for a contract to purchase tungsten from the plaintiff. The negotiations went on from July 1951 to September 11, 1952, when the contract here in suit was signed. Formidable opposition to the contract was offered by American representatives in France, Portugal and England. The character of Dr. Soares and his associates was questioned and investigated. The price tentatively agreed on was greatly reduced at a relatively late period in the negotiations. In April of 1952 the Government sent Mr. Lynton, an engineer selected for his competence in that field, to examine the mines from which the plaintiff expected to obtain its tungsten. Lynton made a long report, in which he concluded that the plaintiff company could obtain the tungsten to fulfill its proposed contract. He recommended that the contract be entered into. As we have said, the contract in question was finally signed on September 11, 1952.

On October 24, an American official in London, General Wilson, telephoned Mr. Larson, the official who had signed the contract on behalf of the Government and advised him that there were "very strong protests" from the American Embassy in Lisbon about the contract, and that the Embassy had informed him of definite attempts on the part of the plaintiff to purchase tungsten from sources other than sources from which the plaintiff, under its contract, was permitted to obtain tungsten. Larson asked Wilson to forward to him any "concrete evidence" which he had relating to the latter point. Wilson on the same day sent to Larson a message stating that another company, Pennsalt, had

cabled that the plaintiff was offering to buy 100 tons of tungsten from it, Pennsalt, for resale to the United States. Wilson's message reached Larson on the next working day, October 27. Larson regarded the Pennsalt cable as "concrete evidence" of violation of its contract by the plaintiff, and forthwith canceled the contract, so advising the plaintiff in a letter stating that the reason for the cancellation was the plaintiff's attempt to buy tungsten in the open market for delivery under the contract.

■ At the trial of this case the Government made no effort to prove that the plaintiff had, in fact, attempted to buy tungsten in the open market to fulfill its obligations under the contract. The stated ground for the cancellation was therefore nonexistent. The Government argues that Mr. Larson had reason to believe that the stated ground existed. Whether he did or not is irrelevant. One may not repudiate his contract obligations upon the ground that he reasonably, though mistakenly, believed that the other party to the contract had breached it.

■ As we have said, the Government seeks to justify its cancellation of the contract on grounds other than the ground stated at the time of the cancellation. One of these is that the plaintiff would not have been able to perform the contract and that therefore the contract was a futile writing, the repudiation of which by the Government could not have harmed the plaintiff.

■ The ability of the plaintiff to perform the contract was the subject of discussion and investigation during the more than a year's time of negotiation of the contract. As we have said, the Government sent its own expert to study that very question and he made a detailed report recommending that the contract be made. When a party to a contract has canceled it before performance has even begun, it can hardly expect a court to excuse its conduct upon anything less than convincing evidence that the contract could not have been performed.

Our findings show that we do not regard the Government's evidence as convincing.

■ The Government says that it was entitled to cancel the contract because of a violation of the contingent fee provision in the contract. This provision said:

"Article XVII. Contingent Fees. The Contractor warrants that no person or selling agency has been employed or retained to solicit or secure this Contract upon an agreement or undertaking for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this Contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage or contingent fee."

At the beginning of the negotiations for the contract Colonel Westbrook filed with the Government officials with whom he was dealing a copy of the written agreement which he and Pulvermann had with the plaintiff covering their employment and their compensation. This agreement appointed them exclusive sales agents of the plaintiff for securing contracts in the United States, Germany and Switzerland for the sale of specified metals, including tungsten. The agreement was for a period of five years, provided for a commission of 5 percent on all sales up to specified tonnages, and retained Westbrook and Pulvermann as industrial consultants without additional compensation.

Our findings show that both these men had unusual qualifications and experience for the work which they undertook for the plaintiff. The plaintiff was a newly organized enterprise. It had no sales agency, and would not have any-

thing to sell unless it could secure contracts which would give stability to the tungsten mining industry for a considerable period of time. It hired Pulvermann and Westbrook as its exclusive sales agents for five years in the only countries in which there was a prospect of obtaining such contracts. They worked diligently for more than a year presenting the plaintiff's offer on its merits to the numerous Government officials who took part in the negotiations. They gave valuable assistance to the plaintiff as industrial consultants concerning the plaintiff's arrangements with its proposed suppliers of tungsten. We think Pulvermann and Westbrook were bona fide employees of the plaintiff.

The Government seems to urge that to be a "bona fide employee" of one contracting with the Government one must be an employee in the master and servant sense, with power in the master to control in detail the servant's activities. That is not the status of a sales agent, who may have several employers. We think the expression "bona fide employee" in the warranty clause in the contract must receive a rational interpretation consistent with its purpose.

In the years 1949 through 1951 an extensive investigation of "Influence in Government Procurement" was carried on by the Investigations Subcommittee of the Senate Committee on Expenditures in the Executive Departments. Hearings before the Investigations Subcommittee of the Senate Committee on Expenditures in the Executive Departments, 81st Cong., 1st Sess., pursuant to S.Res. 52 (August 8–September 1, 1949), and 82nd Cong., 1st Sess., pursuant to S.Res. 51 (March 14–October 5, 1951). Mr. Larson, who signed the contract in the instant case, was an important witness at these hearings. At the conclusion of the 1949 hearings Senate Report No. 1232, 81st Cong., 2d Sess., Jan. 18 (legislative day Jan. 4), 1950, was filed. Mr. Larson's testimony at the hearings, and the comment of the members of the committee show that the warranty clause in question was not intended to forbid customary and honest business practices in negotiating contracts with the Government.

In the 1949 hearings referred to above, Mr. Larson's testimony at pages 616–617 is important. He told the Committee about the regulation of his agency requiring one proposing to negotiate with his agency to disclose whether he had employed a firm other than a full-time employee to solicit the contract, and to agree to furnish information to the contracting officer as requested, relating to the employment. Mr. Larson said that from that information the contracting officer can ascertain

"whether or not in each individual case it is a legitimate attorney, as the chairman has pointed out, a full-time employee, even a contingent fee operation possibly being legitimate.

\* &ast; &ast; &ast; &ast; &ast;

"And he will make the decision then and there."

In the instant case, as we have seen, the plaintiff's agents, at the outset of the negotiations, filed their employment agreement with the Government's negotiating officials. If those officials did not "then and there" decide that the agreement would not be a violation of the warranty clause which would be inserted in any contract which might emanate from the negotiations, they recklessly involved numerous Government officials, and the plaintiff and its agents, in more than a year of strenuous negotiations and great expense, to no purpose. It might be suggested that they knew that the compensation arrangement was improper, but did not raise the question because it would be at the Government's option whether to take advantage of the impropriety or not. Of course no such diabolical thought occurred to them. Their opinion at the time must have been that the compensation arrangement was not in violation of the warranty. We are not persuaded that they were wrong. And if the interpretation of the warranty and its proper application to the

instant situation were doubtful, we think it would be a great wrong to permit the Government to awaken such a "sleeper" to justify its cancellation of a contract which it purported to cancel on another ground which it cannot now defend. Nothing short of a showing that the evils which the warranty provision was intended to prevent were present in the instant situation would justify such a use of it. The evidence shows that such evils were not present.

■ As appears from the foregoing, our conclusion is that the Government breached its contract with the plaintiff and must pay damages for the breach. We must determine how those damages should be measured. The plaintiff urges that it had the right, under its contract, to obtain tungsten from any source, including the open market; that the market price went down substantially during the period when it would have been performing its contract; that it could therefore have bought the tungsten at the low market price and delivered it to the Government at the higher contract price; and that it is entitled to recover the difference between the two prices.

We think the plaintiff did not have the right, under the contract, to deliver tungsten bought by it in the open market, except possibly to a minor extent. It was one of the Government's prime purposes in making the contract to make possible the opening up and development of new sources of tungsten. The contract would not have been made except for the existence of that purpose, and both parties so understood.

The obtaining of tungsten from the mines from which the parties understood that it was to be obained, would have been more costly than buying it in the open market, after the market price went down. But, as we have said, the plaintiff was obligated to deliver tungsten from those mines. As best we can determine, its profit would have been $2.00 per short-ton unit. Since that is all that it would have made if it had been

permitted to perform its contract, such a judgment will compensate it for the Government's breach of contract.

The plaintiff may have a judgment for $508,200.

It is so ordered.

BARKSDALE, District Judge, sitting by designation, JONES, Chief Judge, and LARAMORE and WHITAKER, Judges, concur.